United States District Court

For the Northern District of California

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                  NORTHERN DISTRICT OF CALIFORNIA

8

9   JIMMY BLUNT,                        No. C 10-04087 JSW (PR)

10              Petitioner,

11   v.                                  **ORDER DENYING PETITION
                                         FOR WRIT OF HABEAS
11                                       CORPUS AND CERTIFICATE
12   WARDEN K. CLARK,                    OF APPEALABILITY**

13              Respondent.
                                    /
14

15                          **INTRODUCTION**

16          Petitioner Jimmy Blunt, a California prisoner proceeding *pro se*, filed a habeas corpus

17   petition pursuant to 28 U.S.C. § 2254, seeking a writ of habeas corpus.  The Court ordered

18   Respondent to show cause why the writ should not be granted. Respondent filed an answer

19   and a memorandum of points and authorities in support, and has lodged exhibits with the

20   court.  Petitioner responded with a traverse.  For the reasons set out below, the petition is

21   DENIED.

22                          **BACKGROUND**

23   **I.    Procedural Background**

24          On August 24, 2005, a jury in Alameda County Superior Court convicted Petitioner of

25   first-degree murder in violation of Cal. Penal Code § 187(a).  (Pet. at 2.)  Petitioner also

26   received a sentencing enhancement for personal use of a firearm pursuant to Cal. Penal Code

27   § 12022.53(d).  (*Id.*)  In 2009, Petitioner appealed his conviction, and the California Court of

28   Appeal affirmed the judgment.  (*Id.*)  Petitioner appealed his conviction to the California

1    Supreme Court, which summarily denied review. (*Id.*) Petitioner filed the instant federal

2    petition on September 10, 2010. (Pet. at 1.)

3    **II.    Factual Background**

4           The Court of Appeal summarized the facts of the case as follows:

5    Defendant Jimmy Lee Blunt was convicted of first degree murder.  The
     victim's abandoned car was found a block from defendant's home and her body
6    a block from his grandmother's home, and calls had been made from her cell
     phone to defendant's family members on the night of the murder.  A search of
7    the defendant's room turned up ammunition of the type used in the killing.
     When police questioned defendant after his arrest, he claimed to have been
8    abducted by unknown, masked men on the night of the murder.  After several
     interview sessions stretching over 15 hours, defendant admitted having shot the
9    victim, although he claimed that the unknown men had forced him to do so.

10          The evidence presented at trial demonstrated that the victim and the defendant
     were well acquainted; one witness testified that he was "with her a lot, like as a
11   companion."  The same witness saw him at her home on January 11, 2003, the
     evening she disappeared.  The following evening, January 12, her abandoned
12   car was found a block away from defendant's home.  The interior was
     bloodied, and there were four gun cartridge casings found in the car.  Police
13   also found the victim's cell phone in the car.  On the evening of January 11, the
     cell phone had received calls from defendant's home phone.  Between midnight
14   and 2:00 a.m. of January 12, the cell phone had been used to call defendant's
     relatives, including his grandparents.  Defendant's fingerprint was found on an
15   exterior door column of the victim's car.  On the morning of the next day,
     January 13, the victim's body was found in a trash bin outside a home located
16   down the street from defendant's grandparents' home.  She had been shot four
     times, the bullets matching the casings found in her abandoned car.  A search
17   of defendant's bedroom located a bag of the same type of ammunition.
     Defendant's mother recalled that shortly after midnight on the morning of
18   January 12, he had made a call and left the house, returning about 2:00 a.m.
     After defendant's arrest, as he was being driven to the police station he
19   tearfully mumbled he had "messed up."

20          *A. The Interrogation*

21   At the police station, Defendant was placed in a small, windowless room
     containing a table and three chairs.  He was then questioned during a session
22   that, including breaks, lasted more than 15 hours.  The interrogation began at
     3:40 p.m. on the afternoon of January 16, 2003, and continued on and off until
23   7:00 a.m. the next morning.  Prior to any questioning, Defendant was given a
     meal and provided water periodically thereafter.  Around 11:30 p.m., he was
24   permitted to speak with his mother over the telephone.  Five separate sessions
     of questioning occurred, most lasting around two hours, interspersed with
25   breaks lasting from 30 minutes to four hours.[1]  When the police first began to

26   ────────────────

27          [1] The police log, admitted into evidence at the suppression hearing, shows that after
     questioning began at 3:40 p.m., Petitioner was given a 32-minute break at 5:26 p.m., a 54-
28   minute break at 7:36 p.m., and a 45-minute break at 10:10 p.m.  He was then taken from the

2

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

interview Defendant and again prior to the taped sessions, they gave Defendant *Miranda*[2] warnings or reminded him of his *Miranda* rights. Tapes of the recorded interviews were played to the jury, while officers were permitted to testify about the content of the unrecorded interviews.

During the interview sessions, Defendant related several different accounts of his activities on the night of January 11-12. The accounts shared some features, but important details evolved through the course of the interrogation. In the first taped interview, which began at 6:00 p.m., over two hours after the interrogation began, Defendant told the officers that early in the evening of January 11 he went to his cousin's home, stayed for awhile, and returned home. Around 1:00 a.m., he rode his bicycle to his grandparents' home to borrow money. On the way, his bicycle was hit from behind by an SUV, and he fell off. The masked occupants of the vehicle forced him inside at gunpoint and told him to drive to his grandparents' house, where he obtained the money. After driving around, they let him out. Defendant thought they had picked him up because of his relationship with the victim. During the next interview, which began shortly after 10:00 p.m., six and one-half hours after Defendant had been brought in, he said four masked men with guns forced him into the victim's car. Her body was in the car. The men forced him to touch places in the interior of the car and tried to make him touch the victim's body.

In the third taped interview, which began about 1:30 a.m., 11 hours after Defendant was brought in, he told police that he was forced into a vehicle as he was returning home from his cousin's house about 10:00 p.m. on January 11. The victim's body was lying across the back seat of the vehicle. The men stopped the car, put a pillowcase over Defendant's head, placed a pistol in his hand, aimed it in the direction of the body, and forced Defendant to shoot. The men then forced Defendant to drive to an area near his grandmother's home and help them place the body in a trash bin.

The fourth taped interview began at 6:30 a.m., 15 hours into the interrogation, after Defendant had been permitted a four-hour nap. Defendant told police that the victim had phoned him and told him to meet her at a mall, where she picked him up in her car. A man in the back of the vehicle ordered the victim to drive and later told her to stop the car. The man handed Defendant a gun and told him to shoot the victim. Defendant pointed the gun at her and fired. Defendant then began driving the car, and as he was driving he was forced to shoot the victim again. Later, Defendant took her body from the rear of the car and placed it in the trash bin. The interrogation was ended when Defendant insisted he had told the officers "the beginnin' to the end" of his activities and no longer wanted to talk to them.

Before trial, Defendant moved to suppress his statements to police on the ground they were involuntary. During testimony at the hearing on the motion,

---

interview room for about an hour at 11:00 p.m. and allowed to phone his mother, before questioning resumed at midnight. Another break began at 2:16 a.m., but it appears Petitioner fell asleep during the break, and he was permitted to nap for over four hours. The final interview, after he awoke, lasted less than one-half hour. Based on the police log, the total time spent questioning Petitioner was a little over seven and one-half hours.

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

one of the interrogating officers observed that Defendant appeared "a little nervous, but otherwise, healthy" at the beginning of the interrogation. The officer denied making threats or promises at any time during the interrogation and confirmed that Defendant was permitted approximately four hours of sleep between 2:16 a.m. and 6:27 a.m. He denied that Defendant appeared tired at any point during the questioning, including before the final session following his nap.

The trial court denied the motion to suppress Defendant's statements. After noting the duration of the interrogation, the court observed, "The sad reality is that when one is investigating a homicide, people are inconvenienced.... While [Defendant] may not have been a very happy camper and was very unhappy about the circumstances ... there is nothing in the quality of the tape that indicated his will being overborne, that it was a hostile environment, that he was threatened, that he felt intimidated. There is nothing like that. [¶] ... The questioning is open-ended. [¶] ... His tone of voice was one that indicated a willingness. And the nature of the questioning allowed him to expand. [¶] ... [¶] It's noteworthy that each time the police went back, [Defendant] gave more information. [¶] They did not interrupt his sleeping and allowed him to sleep, albeit it may not be the most comfortable way, but he was permitted to sleep. [¶] There is nothing there to indicate that he was not given the necessities of life, including the bathroom, because he was out [of the room]. He wanted to speak with his mother on the phone. They allowed him to do that.... [T]here is nothing either on the tapes themselves or in the evidence that is before me that ... in any way compelled him to talk to the police against his will, rather that it was voluntarily made in all aspects."

*B. The Alleged Exculpatory Testimony*

Prior to trial, the prosecution moved successfully to preclude Defendant from presenting a witness, Dwayne Irving, to offer an alternative explanation for the victim's killing. According to defense counsel's offer of proof, Irving, who was acquainted with the victim, had been robbed at gunpoint by two men, Ingram and Johnson. Irving thereafter called the victim and complained about the robbery. One week later, Irving was abducted by Ingram, who told him he had been at the victim's home when Irving called. Ingram told him they were driving to meet Johnson, which Irving took to mean he would be killed. When Irving saw a police car, he jumped from Ingram's vehicle and caught the attention of the officers, who arrested Ingram. Police later told Irving that the victim had alerted them that Ingram intended to kill him. According to counsel, Irving claimed the victim was killed one week after Ingram was freed on bail.

At the hearing, the prosecutor told the court that while Irving may have believed he was told by officers the victim had called them about Ingram, there was no reference to the victim in any of the police files on Ingram. Any such contact normally would have been noted in the officers' reports. Further, contrary to Irving's belief as expressed in the defense offer of proof, Ingram had not been released from jail at the time of the victim's killing; rather, he had been in custody continuously since July 2002. Johnson was, however, on bail at the time of the killing.[3]

---

[3] In the transcript of an earlier telephone call made by Irving to the police, he correctly identified Johnson, not Ingram, as the person who had been released on bail prior to the victim's death.

4

United States District Court

For the Northern District of California

1

2
    The trial court tentatively ruled Irving's testimony inadmissible. The court acknowledged the evidence demonstrated that "other people might have a motive" to kill the victim. However, the court noted, the person with the strongest motive was Ingram, who was incarcerated at the time of the victim's death. Although that left Johnson, the court reasoned that there was little to link him to the victim, since it was Ingram who had heard the telephone call and abducted Irving. The court agreed to reconsider admission of the testimony if Defendant could provide some evidence, other than Irving's hearsay contention, that the victim actually told the police about Ingram. In the absence of such evidence, the court viewed the connection between Johnson, the only available killer, and the victim as too speculative.

8   Pet. Ex. A at 2-6.

9                                          **STANDARD OF REVIEW**

10       A district court may not grant a petition challenging a state conviction or sentence on

11   the basis of a claim that was reviewed on the merits in state court unless the state court's

12   adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

13   unreasonable application of, clearly established Federal law, as determined by the Supreme

14   Court of the United States; or (2) resulted in a decision that was based on an unreasonable

15   determination of the facts in light of the evidence presented in the State court proceeding."

16   28 U.S.C. § 2254(d).  The first prong applies both to questions of law and to mixed questions

17   of law and fact, *Williams (Terry) v. Taylor*, 529 U.S. 362, 407-09 (2000), while the second

18   prong applies to decisions based on factual determinations, *Miller-El v. Cockrell*, 537 U.S.

19   322, 340 (2003).

20       A state court decision is "contrary to" Supreme Court authority under the first clause

21   of Section 2254(d)(1) only if "the state court arrives at a conclusion opposite to that reached

22   by [the Supreme] Court on a question of law or if the state court decides a case differently

23   than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*

24   *(Terry)*, 529 U.S. at 412-13.  A state court decision is an "unreasonable application of"

25   Supreme Court authority under the second clause of Section 2254(d)(1), if it correctly

26   identifies the governing legal principle from the Supreme Court's decisions but

27   "unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  The

28   federal court on habeas review may not issue the writ "simply because that court concludes

in its independent judgment that the relevant state-court decision applied clearly established

federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be

"objectively unreasonable" to support granting the writ. *See id.* at 409.

"Factual determinations by state courts are presumed correct absent clear and

convincing evidence to the contrary." *Miller-El*, 537 U.S. at 340. This presumption is not

altered by the fact that the finding was made by a state court of appeals, rather than by a state

trial court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981); *Bragg v. Galaza*, 242 F.3d 1082,

1087 (9th Cir.), amended, 253 F.3d 1150 (9th Cir. 2001). A Petitioner must present clear and

convincing evidence to overcome Section 2254(e)(1)'s presumption of correctness;

conclusory assertions will not suffice. *Id.*

Under 28 U.S.C. 2254(d)(2), a state court decision "based on a factual determination

will not be overturned on factual grounds unless objectively unreasonable in light of the

evidence presented in the state-court proceeding." *Miller-El*, 537 U.S. at 340.

## ANALYSIS

Petitioner presents two grounds for federal habeas relief: (1) Petitioner's third and

fourth statements made to interrogators were coerced and involuntary and as such, the trial

court violated Petitioner's due process rights when it admitted the statements over defense

objection; and (2) Petitioner's due process rights were violated when the state court excluded

proffered evidence that Petitioner was kidnapped and forced to fire the gun.

### I.    Coerced Confession

Voluntariness of a confession is not a factual issue entitled to a presumption of

correctness under 28 U.S.C. § 2254(d), but is a legal question meriting independent

consideration in a federal habeas corpus proceeding. *Miller v. Fenton*, 474 U.S. at 116;

*Collazo v. Estelle*, 940 F.2d 411, 415 (9th Cir. 1991) (en banc) (federal court not bound by

state court finding that confession is voluntary). A federal habeas court must review de novo

the state court's finding that a confession was voluntarily given. *Derrick v. Peterson*, 924

F.2d at 818.

Involuntary confessions in state criminal cases are inadmissible under the Fourteenth

6

United States District Court

For the Northern District of California

1   Amendment. *Blackburn v. Alabama*, 361 U.S. 199, 207 (1960). The voluntariness of a

2   confession is evaluated by reviewing both the police conduct in extracting statements and the

3   effect of that conduct on the suspect. *Miller v. Fenton*, 474 U.S. 104, 116 (1985); *Henry v.

4   Kernan*, 197 F.3d 1021, 1026 (9th Cir. 1999). Absent police misconduct causally related to

5   the confession, there is no basis for concluding that a confession was involuntary in violation

6   of the Fourteenth Amendment. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986); *Norman v.

7   Ducharme*, 871 F.2d 1483, 1487 (9th Cir. 1989).

8          To determine the voluntariness of a confession, the court must consider the effect that

9   the totality of the circumstances had upon the will of the defendant. *Schneckloth v.

10  Bustamonte*, 412 U.S. 218, 226-27 (1973). "The test is whether, considering the totality of

11  the circumstances, the government obtained the statement by physical or psychological

12  coercion or by improper inducement so that the suspect's will was overborne." *United States

13  v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing *Haynes v. Washington*, 373

14  U.S. 503, 513-14 (1963)); *see, e.g., Ortiz v. Uribe*, No. 09-55264 slip op. 20219, 20234 (9th

15  Cir. Nov. 18, 2011) (reminding suspect of his obligation to tell the truth and that his children

16  were counting on him to do the right thing were permissible psychological appeals to his

17  conscience, even if they possibly made him more emotional during the interview);

18  *Cunningham v. Perez*, 345 F.3d 802, 810-11 (9th Cir. 2003) (officer did not undermine

19  plaintiff's free will where interrogation lasted for eight hours and officer did not refuse to

20  give break for food and water); *Clark v. Murphy*, 331 F.3d 1062, 1073 (9th Cir. 2003)

21  (interrogation was non-coercive where suspect was interrogated over a 5-hour period in a 6

22  by 8 foot room without water or toilet, but never requested water or use of toilet); *Ashcraft v.

23  State of Tenn.*, 322 U.S. 143 (1944) (if defendant had confessed after being taken into

24  custody by police officers and interrogated for 36 hours following a seizure, during which

25  period he was held incommunicado, without sleep or rest, relays of officers, experienced

26  investigators, and highly trained lawyers questioned him without respite, that confession

27  would have been involuntary).

28          In the instant case, Petitioner claims his last two statements to police officers were the

7

United States District Court

For the Northern District of California

product of the coercive atmosphere of the interrogations.  Petitioner claims the coercive atmosphere was brought on by (1) Petitioner's fatigue, (2) Petitioner's age, (3) Petitioner's isolation in an interrogation room for fifteen hours, and (4) the persistence and insistence of the interrogators, and their unwillingness to accept Petitioner's version of events until they had a version to their liking.  Petitioner claims that the totality of the circumstances rendered his confession involuntary.

While Petitioner was questioned for over fifteen hours, the Court of Appeal found little evidence that fatigue was a factor in Petitioner's later statements:

> Defendant was given several extended breaks, lessening the impact of the long duration. Although defendant stated at the outset of the first taped interview that he was tired, he never repeated that complaint during the recorded sessions. On the tapes, he speaks quietly, but, as the trial court noted, his voice is alert and responsive. Throughout the four recorded sessions, he answered questions promptly, spoke fairly quickly, and gave narrative, not monosyllabic, answers, without showing signs of fatigue.[4] When defendant fell asleep after the third recorded interview, the officers allowed him to nap.
>
> Defendant was also given food and water during the interrogation. We agree with the trial court that there is no reason to believe, as defendant implies, that he was not given bathroom breaks. The officers permitted repeated breaks during which defendant could have been escorted to the bathroom. Had he been deprived of bathroom opportunities, one would expect him to have commented on that fact during the interviews.

Pet. Ex. A at 9.

Although Petitioner was likely fatigued and worn out by the questioning and the time of night, it was not objectively unreasonable for the Court of Appeal to determine this fatigue was not due to coercive police activity, especially given that the officers did not deprive Petitioner of food, water, or rest.  *See Cunningham*, 345 F.3d at 810-11.

Second, at the time of arrest, Petitioner was twenty years old, about a month away from his next birthday.  The suspect's age may be taken into account in determining whether a confession was voluntary.  *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (en banc)

---

[4] Defendant's attitude at the beginning of the fourth recorded session was more reserved, but this appears to have been a result of upset caused by his own admissions and his frustration with the interview process, rather than fatigue. After a fairly short time, defendant said that he no longer wanted to talk to the officers, and the interview ended. (Original footnote renumerated).

United States District Court

For the Northern District of California

1   (that petitioner was a juvenile "is of critical importance in determining the voluntariness of

2   his confession"). *See, e.g., id.* at 1009, 1012 (nearly thirteen hours of relentless overnight

3   questioning of a sleep-deprived seventeen-year-old by a tag team of officers, without the

4   presence of an attorney, and without the protections of proper *Miranda* warnings, overbore

5   the will of that teen, rendering his confession involuntary); *Taylor v. Maddox*, 366 F.3d 992,

6   1015-16 (9th Cir. 2004) (confession involuntary where a sixteen-year-old was interrogated

7   for three hours in the middle of the night without an attorney or parent, given no food,

8   offered no rest break, may or may not have been given water, threatened by officer's jabbing

9   ring in his face and drawing diagram of a grim future if he did not confess, and denied access

10  to telephone to contact attorney).  However, in the instant case, Petitioner was not a juvenile

11  at the time of his arrest, and he does not adequately show, beyond merely stating how old he

12  was at the time, how his age rendered his confession involuntary.

13      Third, the Court of Appeal reasonably determined that Petitioner "was not wholly

14  isolated, despite being held in a small room."  Pet. Ex. A at 8.  Petitioner was permitted to

15  leave the interrogation room to speak on the phone with his mother.  *Id.*  Following that

16  break, Petitioner requested the next discussion be led by Sergeant Longmire, an officer

17  Petitioner met when he was on the phone.  *Id.* at 9.  Thus, while Petitioner spent long periods

18  of time in Room 202, he was not held incommunicado or in isolation.

19      Lastly, the Court of Appeal concluded there was no misconduct in the officers'

20  behavior:

21      The officers were persistent, continuing to question defendant for an extended
        period of time, they were not *insistent*.  This was not a situation in which the
22      officers refused to accept a defendant's denials and badgered him or her until a
        confession emerged. Rather, defendant's story evolved as the night progressed,
23      suggesting both that he had not given a full and accurate account and that he
        would reveal more of the truth under further questioning. The officers were
24      therefore justified in persisting in questioning defendant until a fixed story
        emerged, and they did so without browbeating or otherwise attempting to
25      intimidate him.

26  Pet. Ex. A at 8 (emphasis in original).

27      The officers' questioning reflected a need to ascertain the truth about the events of that

28  night, especially given that Plaintiff's account changed and expanded over the course of the

United States District Court

For the Northern District of California

1  interviews.  The record does not reflect, and Petitioner does not claim, that the officers

2  threatened him, tricked him, or tortured him.  Upon invoking his right to silence, Sergeant

3  Brock ended the interview by stating, "the fact that [Petitioner doesn't ] want us to talk to

4  [us] anymore...[means] we're gonna have to stop."  Ans. Ex. A-22 at 14.

5      Moreover, the Court of Appeal would only be able to find Petitioner's confession

6  involuntary if the officers had used coercive activity to undermine his ability to exercise his

7  free will.  *Derrick v. Peterson*, 924 F.2d 813, 818 (9th Cir. 1990).  On the contrary, the Court

8  of Appeal found evidence that Petitioner "continued to exercise his will throughout the

9  interrogation."  Pet. Ex. A at 9.  Upon leaving the interview room to use the telephone,

10  Petitioner "noticed a third police officer sitting outside the room and, prior to the third

11  recorded interview, asked for that officer to participate in the questioning, a request that was

12  granted."  *Id.*  The Court of Appeal inferred that "even at the hour of 1:00 a.m., [Petitioner]

13  was voluntarily participating in, and even seeking to control the interrogation."  *Id.*

14      Considering the totality of the circumstances, it was reasonable for the Court of

15  Appeal to find that Petitioner failed to adequately plead coercive activity on the part of

16  officers, and that Petitioner failed to show how such coercive activity undermined his ability

17  to exercise free will.  As such, the Court of Appeal's rejection of Petitioner's claim was not

18  contrary to, or an unreasonable application of Supreme Court precedent, nor was it based on

19  an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  Petitioner's claim that his

20  third and fourth statements to officers were coerced and involuntary fails.

21      Assuming, *arguendo*, that Petitioner's confession was the subject of police coercion,

22  the erroneous admission of a coerced confession is subject to harmless error analysis.

23  *Fulminante v. Arizona*, 499 U.S. 279, 306-12 (1991).  In other words, habeas relief is

24  appropriate only if the coerced confession had a "'substantial and injurious effect or

25  influence in determining the jury's verdict.'"  *Pope v. Zenon*, 69 F.3d 1018, 1025 (9th Cir.

26  1995) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

27      During their harmless error analysis, the Court of Appeal found evidence that

28  Petitioner was the killer "very strong" because the case against Petitioner did not rely solely

10

on the allegedly coerced confession.  Pet. Ex. A at 11.

> The evidence demonstrated that defendant was acquainted with the victim and had been in her company earlier on the evening she was killed. Her car was found abandoned within a block of his home bearing his fingerprints, and her body was found within a block of his grandparents' home. He had ammunition in his closet of the same type used in the killing. On the early morning of the killing, defendant was absent from his home, and no one could account for his whereabouts. During that time, the victim's cell phone was used to make calls to defendant's family members. Finally, defendant did not challenge the admission of his first two statements, during which he acknowledged being in the presence of the victim's body that night.

*Id.*

While the allegedly coerced confessions may have played a part in the jury's decision making process, it cannot be said that their admission had a "substantial or injurious effect" on the jury's verdict in light of the overwhelming evidence against him. *See Brecht*, 507 U.S. at 637.  Thus, even if Petitioner's confessions had been coerced, their admission at trial was harmless and habeas relief is not warranted.

**II.    Exclusion of Evidence**

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  *See Pulley v. Harris*, 465 U.S. 37, 41 (1984); *Jammal v. Van de Kamp*, 926 F.2d 918, 919-20 (9th Cir. 1991); *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985), *cert. denied*, 478 U.S. 1021 (1986).  "State and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials."  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotations and citations omitted); *see also Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all relevant evidence).

This latitude is limited, however, by a defendant's constitutional rights to due process and to present a defense, rights originating in the Sixth and Fourteenth Amendments.  *See Holmes*, 547 U.S. at 324.  Well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice,

11

confusion of the issues, or potential to mislead the jury. *Id.* at 325-26; *see Egelhoff*, 518 U.S. at 42 (holding that the exclusion of evidence does not violate the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.").

In deciding if the exclusion of evidence violates the due process right to a fair trial or the right to present a defense, the court balances the following five factors: (1) the probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely cumulative; and (5) whether it constitutes a major part of the attempted defense. *Chia v. Cambra*, 360 F.3d 997, 1004 (9th Cir. 2004) (citing *Miller v. Stagner*, 757 F.2d 988, 994 (9th Cir. 1985)). The court must also give due weight to the state interests underlying the state evidentiary rules on which the exclusion was based. *See Chia*, 360 F.3d at 1006; *Miller*, 757 F.2d 988, 995 (9th Cir. 1985).

The exclusion of evidence that another person may have committed the crime violates due process and the Sixth Amendment. *See Chambers v. Mississippi*, 410 U.S. 284 302-03 (1972); *Lunbery v. Hornbeak*, 605 F.3d 754, 760 (9th Cir. 2010) (exclusion of critical hearsay testimony pointing to another killer was an unreasonable application of *Chambers*); *but see Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983) (no constitutional violation in excluding evidence that another man was seen near scene and that he had history of sexual attacks where identification of petitioner was strong).

To be admissible, third-party culpability evidence need not show substantial proof of a probability that the third person committed the act, but need only be such direct or circumstantial evidence linking the third person to the actual perpetration of the crime as to be capable of raising a reasonable doubt of defendant's guilt, subject to the trial court's discretion under Cal. Evid. Code, § 352, to reject evidence that creates a substantial danger of undue consumption of time or of prejudicing, confusing, or misleading the jury. *People v. Hall*, 718 P.2d 99 (Cal. 1986). Therefore, where a defendant attempts to present a third-party culpability defense, the exclusion of that evidence is prejudicial error where the proffered

United States District Court
For the Northern District of California

1  evidence is (1) reliable, (2) probative of critical facts, (3) capable of evaluation by a jury, and

2  (4) where exclusion of the evidence would preclude the presentation of a third-party

3  culpability defense entirely.  *Alcala v. Woodford*, 334 F.3d 862, 883-84 (9th Cir. 2003).

4        Petitioner claims his due process rights were violated when the state court excluded

5  evidence of Petitioner having been kidnapped and forced to fire the gun.  Pet. at 9.  At trial,

6  Petitioner attempted to present the testimony of Dwayne Irving, an acquaintance of the

7  victim, to show an alternative explanation for the victim's death.  *See supra* at 4.  Irving's

8  testimony included an account of being robbed at gunpoint by two men, Ingram and Johnson,

9  whom Petitioner blamed for the killing.  *Id.*  Given the inconsistent nature of Irving's

10  testimony, the Court of Appeal reasonably determined Petitioner's proffered testimony was

11  unreliable and lacking in probative value:

> Although defendant contends the testimony demonstrated that another person
> had "a motive, the means and an opportunity" to have committed the murder,
> it does not. While the proffered testimony may have tended to prove Ingram
> had a motive, he was in jail and he had neither means nor opportunity to
> murder the victim. While Johnson was not in custody, Irving's testimony
> provided no evidence of his location on the night of the killing. Whether he
> had the means and an opportunity to kill the victim is therefore unknown.
> More important, the evidence did not establish a motive for Johnson.
> Crediting Irving's hearsay testimony, it would establish the victim had tipped
> off the police that Ingram, or possibly Ingram and Johnson, intended to harm
> Irving. There was no evidence, however, that Ingram knew the victim had
> done this. The phone call Ingram purportedly overheard was between Irving
> and the victim, not the victim and the police. Irving's testimony therefore
> reveals no more than that Ingram knew the victim had been told he and
> Johnson had robbed Irving. This was hardly motive for Ingram to murder the
> victim. Further, there was no evidence Ingram ever told Johnson that the
> victim knew about the Irving robbery. As a result, the testimony proffered by
> defendant lacked any proof that (1) Ingram was aware the victim had alerted
> the police, (2) Johnson was aware the victim had alerted the police, or even
> (3) Johnson was aware that the victim knew about the robbery. Accordingly,
> Irving's testimony provided no evidence that Johnson had any motive to kill
> the victim, or even that he knew of her. The evidence was insufficiently
> probative of a material fact to justify its admission, and it certainly did not
> raise a reasonable doubt about defendant's guilt.
>
> Further, the evidence did not, as required for the admission of third party
> culpability testimony, connect either Ingram or Johnson to the actual
> perpetration of the crime. As noted, Ingram was in jail on the night of the
> murder, while Johnson's whereabouts were unknown.  Defendant contends
> that his own testimony of abduction links one or both of these men to the
> crime, since the presence of others with a motive to kill the victim
> "support[ed][his] assertions of having been kidnapped and forced to fire the
> gun." Irving's story, however, was inconsistent with defendant's statements to

the police. Defendant told the police that the masked, unidentified men who abducted him and forced him to kill the victim kept demanding to know where something-either money or drugs-was located. Defendant speculated from the abductors' comments that the victim had taken drugs or money from them and they believed he knew where it was located. For example, in the third recorded interview defendant told the police, "I guess she owed him some money or ... offa some drugs ... she was doin' ... she wasn't payin' or she was getting credit off of it."  In contrast, Irving's proposed testimony with respect to the motive of Ingram or Johnson had nothing to do with the victim's having obtained money or drugs. Rather, they would have been trying to silence her about the Irving robbery or seeking revenge for the victim's telling the police that Ingram was trying to harm Irving. Because defendant's statements suggested that his abductors were interested in recovering money rather than silencing a witness, they provided no support for the conclusion that Johnson was one of the masked men. As a result, there was no testimony that linked Ingram and Johnson to the murder. The evidence was properly excluded.

(Pet. Ex. A at 12-13.)

Moreover, although the trial judge tentatively ruled that Irving's testimony was inadmissible, he agreed to reconsider admission of the testimony if Petitioner could provide some evidence, other than Irving's hearsay contention, that the victim told the police about Ingram.  Pet. Ex. A at 6.  The trial court acknowledged that the proffered evidence demonstrated other people might have a motive to kill the victim, but without a stronger showing, the court viewed the connection between Johnson, the only available killer, and the victim as too speculative.  *Id.*  Thus, because the trial court was willing to hear more evidence on the matter, in contrast to *Alcala*, it cannot be said that the exclusion of the Irving's testimony entirely precluded Petitioner from presenting a third-party culpability defense.  *See Alcala*, 334 F.3d at 883-84.  The Court of Appeal's rejection of this claim was not contrary to, or an unreasonable application of, clearly established Federal law, nor was it based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  As such, the exclusion of this evidence was not a violation of due process or the Sixth Amendment.

Assuming, *arguendo,* that the state court's exclusion of third-party culpability evidence was error, in order to obtain habeas relief on the basis of that evidentiary error, Petitioner must show it had "'a substantial and injurious effect on the verdict.'"  *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting *Brecht*, 507 U.S. at 623).

The Court of Appeal found Irving's testimony to be "irrelevant" and therefore

14

concluded that "its exclusion was not prejudicial under any standard, including the harmless beyond a reasonable doubt standard for constitutional violations." Pet. Ex. A at 14. While the admission of third-party culpability evidence may have factored into the jury's decision making process, given the overwhelming independent evidence of guilt presented at trial, it cannot be said that its exclusion had a substantial or injurious effect on the verdict. *See Dillard*, 244 F.3d at 767 n.7. Even if the evidence was excluded in error, its exclusion was harmless and accordingly, habeas relief is not warranted.

**CONCLUSION**

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find this Court's denial of his claim debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, no certificate of appealability is warranted in this case.

The clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED:  March 29, 2012

_____
JEFFREY S. WHITE
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

JIMMY BLUNT,

            Plaintiff,

  v.

K CLARK et al,

            Defendant.
_____/

Case Number: CV10-04087 JSW

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on March 29, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Jimmy Blunt
V91795
Salinas Valley State Prison
P.O. Box 1050
Soledad, CA 93960

Dated: March 29, 2012

Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk

United States District Court
For the Northern District of California